# 25-678

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

BRIAN WUOTI, KAITLYN WUOTI, MICHAEL GANTT, REBECCA GANTT,

*Plaintiffs-Appellants,*

v.

CHRISTOPHER WINTERS, in his official capacity as Commissioner of
Vermont Department of Children and Families; ARYKA RADKE, in her
official capacity as Deputy Commissioner of the Family Services
Division; STACEY EDMUNDS, in her official capacity as Director of
Residential Licensing & Special Investigations,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Vermont
Case No. 2:24-cv-614

## OPENING BRIEF OF APPELLANTS

John J. Bursch
Caroline C. Lindsay
Suzanne E. Beecher
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
clindsay@ADFlegal.org
sbeecher@ADFlegal.org

James A. Campbell
Johannes Widmalm-Delphonse
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
jwidmalmdelphonse@ADFlegal.org

Jonathan A. Scruggs
Henry W. Frampton, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Gretchen M. Wade
WADLEIGH, STARR & PETERS, PLLC
95 Market Street
Manchester, NH 03101
(602) 206-7262
gwade@wadleighlaw.com

*Counsel for Appellants*

**CORPORATE DISCLOSURE STATEMENT**

Plaintiff-Appellants Brian and Kaitlyn Wuoti and Michael and Rebecca Gantt are individuals.

# TABLE OF CONTENTS

Corporate Disclosure Statement.................................................................i

Table of Authorities...............................................................................iv

Statement Regarding Oral Argument ....................................................1

Statement of Jurisdiction........................................................................1

Statement of Issues ................................................................................2

Introduction.............................................................................................4

Statement of the Case .............................................................................6

Standard of Review ...............................................................................15

Summary of the Argument ...................................................................15

Argument................................................................................................17

I.   Vermont compels and restricts Plaintiffs' speech based on
     viewpoint. ........................................................................................18

     A.   Vermont compels Plaintiffs' speech based on viewpoint......18

     B.   Vermont restricts Plaintiffs' speech based on
          viewpoint. ..........................................................................20

     C.   When a policy applies to speakers based on their
          message, it regulates speech and not conduct.....................21

II.  Vermont burdens Plaintiffs' religious exercise via a policy
     that is not neutral or generally applicable. ...................................26

     A.   Vermont's many exemptions treat religious exercise
          worse than comparable secular conduct.............................27

     B.   Vermont allows individualized assessments. ......................32

ii

III.   Vermont's Policy fails any level of heightened scrutiny...............35

    A.    The Policy does not advance a compelling government interest. ...............................................................................35

        1.    Silencing disfavored viewpoints is not a legitimate, much less compelling interest. .................36

        2.    Arbitrarily excluding families worsens the foster-care "crisis."...................................................39

    B.    Vermont's Policy fails narrow tailoring. ...............41

        1.    Vermont ignores less-restrictive alternatives in favor of a prophylactic policy. ......................42

        2.    Speculative fears can't justify certain constitutional burdens. .................................47

    C.    Vermont's flawed evidence reveals ideological, not evidence-based, goals. ..........................................54

IV.   Plaintiffs deserve a preliminary injunction.................60

Conclusion ........................................................................61

Certificate of Compliance ...................................................63

Certificate of Service ..........................................................64

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ............................................................ passim

*44 Liquormart, Inc. v. Rhode Island,*
517 U.S. 484 (1996) ....................................................... 41

*A.H. ex rel. Hester v. French,*
985 F.3d 165 (2d Cir. 2021)......................................... 15, 55

*Agudath Israel of America v. Cuomo,*
983 F.3d 620 (2d Cir. 2020)........................... 15, 30, 60, 61

*Alexander v. Cahill,*
598 F.3d 79 (2d Cir. 2010)............................................ 40

*American Amusement Machine Association v. Kendrick,*
244 F.3d 572 (7th Cir. 2001) ....................................... 56

*Axson-Flynn v. Johnson,*
356 F.3d 1277 (10th Cir. 2004) .................................... 34

*Bates v. Pakseresht,*
2023 WL 7546002 (D. Or. Nov. 14, 2023) ..................... 24

*Bery v. City of New York,*
97 F.3d 689 (2d Cir. 1996)........................................... 45

*Bethel School District No. 403 v. Fraser,*
478 U.S. 675 (1986) ..................................................... 25

*Blais v. Hunter,*
493 F. Supp. 3d 984 (E.D. Wash. 2020) ................... 27, 33

*Bolger v. Youngs Drug Products Corp.,*
463 U.S. 60 (1983) ....................................................... 51

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000) ..................................................... 22

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) ................................................................ passim

*Burke v. Walsh,*
    2024 WL 3548759 (D. Mass. June 5, 2024) .................................. 34

*Central Rabbinical Congress of United States & Canada v. New York City Department of Health & Mental Hygiene,*
    763 F.3d 183 (2d Cir. 2014) ........................................................ 30

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
    868 F.3d 104 (2d Cir. 2017) ............................................. 43, 45, 49

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ......................................................... 27, 31, 35

*Cohen v. California,*
    403 U.S. 15 (1971) ........................................................... 23, 24, 50

*Consolidated Edison Company of New York v. Public Service Commission of New York,*
    447 U.S. 530 (1980) ..................................................................... 59

*Cornelio v. Connecticut,*
    32 F.4th 160 (2d Cir. 2022) ........................................................ 50

*Doe v. County of Centre,*
    242 F.3d 437 (3d Cir. 2001) ........................................................ 52

*Doe v. Phillips,*
    81 F.3d 1204 (2d Cir. 1996) ........................................................ 28

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975) ..................................................................... 53

*FEC v. Wisconsin Right To Life, Inc.,*
    551 U.S. 449 (2007) ..................................................................... 35

*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*,
    82 F.4th 664 (9th Cir. 2023) .................................................... 29, 30

*Frisby v. Schultz*,
    487 U.S. 474 (1988) ........................................................ 45

*Frost v. Railroad Commission of California*,
    271 U.S. 583 (1926) ........................................................ 41

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021) .................................................. passim

*Garrett v. Garrett*,
    527 N.W.2d 213 (Neb. Ct. App. 1995) ............................................ 51

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .................................................. 22, 23, 25

*Honeyfund.com Inc. v. Governor*,
    94 F.4th 1272 (11th Cir. 2024) ...................................... 22

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
    515 U.S. 557 (1995) .............................................. 18, 22, 38

*Husain v. Springer*,
    494 F.3d 108 (2d Cir. 2007) ........................................... 21

*Iancu v. Brunetti*,
    588 U.S. 388 (2019) .................................................. passim

*In re Adoption of E*,
    279 A.2d 785 (N.J. 1971) .................................................. 5, 28, 54

*Janus v. American Federation of State, County, & Municipal Employees, Council 31*,
    585 U.S. 878 (2018) .............................................. 38, 41

*Kennedy v. Bremerton School District*,
    597 U.S. 507 (2022) .................................................. 5, 26, 27, 44

*Martin v. City of Struthers*,
   319 U.S. 141 (1943) ...................................................... 50, 53

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ...................................................... 46, 49

*Menora v. Illinois High School Association*,
   683 F.2d 1030 (7th Cir. 1982) ........................................ 55

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ......................................... 25, 26

*National Association for Advancement of Colored People v. Button*,
   371 U.S. 415 (1963) ...................................................... 21

*New Hope Family Services, Inc. v. Poole*,
   966 F.3d 145 (2d Cir. 2020).......................................... 15, 23

*New York Progress & Protection PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013)........................................... 15

*Paskar v. City of New York*,
   3 F. Supp. 3d 129 (S.D.N.Y. 2014) ................................ 7

*Pater v. Pater*,
   588 N.E.2d 794 (Ohio 1992) ......................................... 51

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) .............................................. 24, 36, 37

*Ramirez v. Collier*,
   595 U.S. 411 (2022) ...................................................... 46

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
   487 U.S. 781 (1988) ...................................................... 45

*Rosenberger v. Rector & Visitors of University of Virginia*,
   515 U.S. 819 (1995) ............................................. 19, 21, 36

*Safelite Group, Inc. v. Jepsen*,
   764 F.3d 258 (2d Cir. 2014)........................................... 35

*Schneider v. State of New Jersey*,
    308 U.S. 147 (1939) .................................................................. 45

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ............................................................. 27, 30

*Texas v. Johnson*,
    491 U.S. 397 (1989) .................................................................. 36

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) .................................................................. 27

*Tyler v. Hillsdale County Sheriff's Department*,
    837 F.3d 678 (6th Cir. 2016) ....................................................... 49

*United States v. Alvarez*,
    567 U.S. 709 (2012) .................................................................. 59

*United States v. Miselis*,
    972 F.3d 518 (4th Cir. 2020) ....................................................... 22

*United States v. Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000) ................................................... 47, 50, 52, 53

*Video Software Dealers Association v. Schwarzenegger*,
    556 F.3d 950 (9th Cir. 2009) ....................................................... 58

*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*,
    536 U.S. 150 (2002) ............................................................. 50, 52

*We The Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021) ........................................................ 34

*We The Patriots USA, Inc. v. Hochul*,
    17 F.4th 368 (2d Cir. 2021) ........................................................ 34

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943) ......................................................... 20, 38, 41

*Williams v. Annucci*,
    895 F.3d 180 (2d Cir. 2018) ............................................. 29, 44, 54, 55

*Zummo v. Zummo*,
  574 A.2d 1130 (Pa. Super. Ct. 1990) ...............................................51

**Statutes**

28 U.S.C. § 1292 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1343 .................................................................................1

28 U.S.C. § 2107 .................................................................................1

42 U.S.C. § 1983 .................................................................................1

47 U.S.C. § 675 ...................................................................................8

Ariz. Rev. Stat. § 8-921.....................................................................47

H.B. 1669, 95th Gen. Assemb., Reg. Sess. (Ark. 2025) ...................47

Ga. Code Ann. § 49-5-281.................................................................47

Idaho Code § 16-1648 .......................................................................47

H.B. 2311, 2025-2026 Reg. Sess. (Kan. 2025)...................................47

Miss. Code. Ann. § 11-62-3...............................................................47

Miss. Code. Ann. § 11-62-5...............................................................47

Tenn. Code Ann. § 37-6-102 .............................................................47

26 Tex. Admin. Code § 749.1003.......................................................25

33 Vt. Stat. § 104 ................................................................................7

**Other Authorities**

Caitlin Ryan, *Parents Don't Have to Choose Between Their Faith
  and Their LGBT Kids*, Wash. Post (Jan. 7, 2015) .......................57

Catherine Gimbrone et al., *The Politics of Depression: Diverging Trends in Internalizing Symptoms Among US Adolescents by Political Beliefs*, 2 SSM Mental Health 100043 (2022) ................ 60

David M. Smolin, *Kids Are Not Cakes: A Children's Rights Perspective on Fulton v. City of Philadelphia*, 52 Cumb. L. Rev. 79 (2022) ................................................. 40

Department of Health and Human Service, *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (2025) ................................................. 59

George Yancey, *Identity Politics, Political Ideology, and Well-being: Is Identity Politics Good for Our Well-being?* 38 Sociological Forum 4 (2023) ................................................. 60

Gordan Guyatt et al., *Users' Guide to the Medical Literature: A Manual for Evidence-Based Clinical Practices* (3d ed. 2015)........ 58

*Support*, Webster's Third New Int'l Dictionary (1993) .......................... 22

## **Rules**

Federal Rule of Appellate Procedure 4(a)(1)(A)........................................ 1

## **Regulations**

45 C.F.R. § 1355 ................................................. 46

*Designated Placement Requirements Under Titles IV-E and IV-B for LGBTQI+ Children*, 89 Fed. Reg. 34,818 (April 30, 2024) ................................................. 46, 52, 56, 58

## STATEMENT REGARDING ORAL ARGUMENT

This case concerns a matter of first impression in this Circuit: whether a state may categorically exclude families from foster care because of their protected speech and religious beliefs. At the time of this filing, no other Court of Appeals has addressed this important question, though the Ninth Circuit will likely do so soon. Given the important interests at stake, Plaintiff-Appellants Brian and Kaitlyn Wuoti and Michael and Rebecca Gantt request oral argument.

## STATEMENT OF JURISDICTION

Plaintiff-Appellants Brian and Kaitlyn Wuoti and Michael and Rebecca Gantt sued the named appellees in the United States District Court for the District of Vermont under 42 U.S.C. § 1983, alleging violations of their First and Fourteenth Amendment rights. The district court exercised federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343 and had the authority to consider the requested injunctive relief under 28 U.S.C. § 1343.

The district court denied Appellants' motion for a preliminary injunction on February 20, 2025. Special App. ("SA") 002. Appellants timely filed their notice of appeal on March 21, 2025, within the 30-day period established in 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a)(1)(A). Joint App. ("JA") 663. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

1

## STATEMENT OF ISSUES

A Vermont Department of Children and Families policy requires prospective foster parents to be "holistically affirming and supporting" of a child's identity. JA071. To support a child's sexual orientation and gender identity, the policy requires foster parents to agree to speak words (like pronouns) and attend events (like pride parades), "even if the foster parents hold divergent personal opinions or beliefs." JA070. Parents who state religious objections to this policy cannot foster *any* child, regardless of whether the child identifies as LGBT, and even though Biden Administration regulations tell states to match children with families while accommodating religious parents who do not want to violate their beliefs on this topic. Admittedly, Vermont does not require comparable mandates to support a foster child's religious or cultural identity. Vermont also allows prospective foster parents to decline placements for reasons unrelated to sexual orientation and gender identity—including religious or cultural practices, disability, age, or sex, or because the placement would not be a good fit.

Plaintiffs are two couples who lost their foster-care licenses because they will not speak or act in ways that violate their religious beliefs about sex and gender. This appeal raises two questions:

1.     Whether Vermont's policy violates the Free Speech Clause of the First Amendment by compelling and restricting Plaintiffs' speech based on viewpoint.

2.    Whether Vermont's policy violates the Free Exercise Clause of the First Amendment by burdening Plaintiffs' free-exercise rights through a system of individualized and categorical exemptions.

## INTRODUCTION

Vermont's foster-care system is in "crisis." JA064. Too many children. Too few homes. Vulnerable kids are being shuttled between the sheriff's office and apartments with no other options.

Plaintiffs Brian and Kaitlyn Wuoti and Michael and Rebecca Gantt want to help. They were model foster parents for years and were described by state officials as "amazing," "wonderful," "kind," and "welcoming." JA121, 137. Yet Vermont revoked both families' licenses when they expressed their religious belief that a person should live consistent with their sex and pursue sexual behavior only within marriage between one man and one woman. That made them "unqualified" to parent any child (even a relative) of any age (even an infant) and for any length of time (even a few hours), no matter what the child believes and no matter how the child identifies. This exclusion burdens constitutional rights as much as it needlessly deprives children of loving homes.

In the Green Mountain State, families must be "holistically affirming and supporting" of a child's sexual identity and gender expression "even if the foster parents hold divergent personal opinions or beliefs." JA070–71. This requires foster parents to speak words like chosen pronouns and to attend events like pride parades. They must also refrain from exposing children to the view that sex is fixed and cannot be changed. The goal is to suppress ideas and viewpoints with

4

which Vermont disagrees—exactly what the First Amendment
prohibits.

In the foster-care context, Vermont also grants many
individualized and categorical exemptions—the opposite of a neutral,
generally applicable policy. After all, every family comes with a unique
religious or cultural background, and Vermont concedes it does not force
others to "compromise their own beliefs." JA290. "Respect for religious
expressions is indispensable to life in a free and diverse Republic."
*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022). Yet on this
one issue, Vermont demands uniformity—excluding anyone who holds a
different view.

The district court dismissed these constitutional concerns, reason-
ing that the First Amendment doesn't apply. In its view, parenting
transforms protected speech into punishable conduct, and an
underinclusive policy is generally applicable even when there's a formal
mechanism for granting exemptions. But that logic would give states
unlimited power to exclude parents from foster care for harboring the
"wrong" beliefs or expressing the "wrong" views—such as atheists who
question Christianity or parents who want to use Vermont's language
affirming children's LGBT identity. *See*, *e.g.*, *In re Adoption of E*, 279
A.2d 785 (N.J. 1971) (reversing exclusion of atheists from adoption).
This Court should not follow Vermont off that cliff.

5

While the district court held that strict scrutiny did not apply, it found that Vermont had still carried that heavy burden because a child might someday identify, form a belief, or act in a way that conflicts with Plaintiffs' religious beliefs. But disagreement with your child is a universal parenting experience. The State provides no justification for its position that such disagreements are disqualifying *only* when they are about sexual and gender identities.

Vermont never actually began the steep climb that strict scrutiny demands. Instead, it pitched its tent at base camp and called it a summit—never showing how its policy promotes children's welfare, never trying less-restrictive alternatives, and never proving that its policy rests on empirical evidence rather than ideological dogma.

Plaintiffs will love any child no matter how that child identifies. They simply do not want to lie about their beliefs. Vermont's demand for ideological conformity under the guise of child welfare violates Plaintiffs' First Amendment rights. This Court should reverse the district court and instruct it to preliminarily enjoin Vermont's policy.

## STATEMENT OF THE CASE

### Vermont's need for foster families

Vermont's foster-care system is in a self-described "crisis," with not "enough homes and supports to fill the need." JA064, 259; *see also* Add.005. In 2022 to 2024, Vermont's Department of Children and

Families ("DCF" or "Department"), sent out emails with headlines like: "Desperate need for Emergency Foster Homes," and statements like: "We need you! Family Services is in a crisis beyond what we have seen before." JA064.

This shortage has led to many children residing in residential treatment centers and a practice called "staffing," where children are "held at a hotel, sheriff's office, or other location, with no access to education, treatment, peer interactions, or community engagement." Add.008.[1] According to Vermont's Office of the Child, Youth and Family Advocate, "[a] 'staffing' is an unlicensed, unregulated place that isolates children." Add.008.

The foster-care licensing and placement processes

Vermont is required to "provide for [the] care, maintenance, and education" of children in foster care. 33 Vt. Stat. § 104(9). To this end, Vermont requires prospective foster parents to obtain a state-issued license. JA028. The process is individualized to each applicant. For example, officials may grant a discretionary "variance" from many of the Department's Licensing Rules for Foster Families ("Licensing Rules," "Rules," or "Rule XX" to refer to a specific rule). SA037; JA034.

---

[1] An excerpt of the Office of the Child, Youth and Family Advocate, 2024 Annual Report is provided in the Addendum to this brief. A full copy is available here: https://perma.cc/Z9JJ-LTKE. *See Paskar v. City of New York*, 3 F. Supp. 3d 129, 134 (S.D.N.Y. 2014) ("Official government reports … are appropriate for judicial notice.").

The Department can also limit a license to fostering children of a certain age, gender, or developmental and physical need. JA029.

The Department also individualizes the placement process to match children with families. JA030–33. The Department seeks to "[a]chieve permanency options that are in the best interest of children and youth." JA178. To this end, it must place children in the "least restrictive (most family like)" setting possible, "consistent with the best interest and special needs of the child[.]" JA030 (citing 47 U.S.C. § 675(5)(A)). This prioritizes family or kinship placements first, followed by families licensed for general foster care, and lastly, institutions like residential treatment centers. JA030; Add.006–7.

Rule 200 prohibits "any form of discrimination against a foster child based on race, religion, color, national origin, sex, sexual orientation, gender identity, age, or disability." SA041. Still, families may decline a placement if they feel it would not be a good fit, including because of the child's religious, ethnic, or cultural practices. JA032–33. Families may also decline to take children based on the child's sex, age, disability, or for "a variety of reasons." SA041; JA033, 448.

<u>Vermont's Discriminatory Policy</u>

In 2016, Vermont formed an "LGBTQ Workgroup" to make policy recommendations on caring for LGBT foster children. JA311. This taskforce led the Department to promulgate Policy 76, titled: "Supporting and Affirming LGBTQ Children & Youth." JA163, 312–13.

Among other things, it provides guidance on families who are insufficiently "supportive" of children's sexual orientation or gender identity. JA163. It states that DCF workers should encourage families to "[s]upport children's identities even if it feels uncomfortable"; "[b]ring young people to LGBTQ organizations and events in the community"; and "[s]upport young people's gender expression." JA168. In 2018, the Department began "incorporating" Policy 76 into its Licensing Rules (JA315), including:

- **Rule 201**: Applicants and foster parents shall exhibit … 201.2 Knowledge of child and adolescent development and the needs of children; and

- **Rule 301**: Foster parents shall meet the physical, emotional, developmental and educational needs of each foster child, in accordance with the child's case plan.

Years later, the Department initiated rulemaking and promulgated:

- **Rule 315**: Foster parents shall support children in wearing hairstyles, clothing, and accessories affirming of the child's racial, cultural, tribal, religious, or gender identity.

SA044; JA371, 373.

The Department also added a provision to Rule 35 (providing for variances), stating: "Under no circumstances will the state licensing authority grant a variance from rules … 201[ ] or 315." SA037, JA371,

9

373. Notably, Rule 35 allows variances to Rule 301. SA037. Plaintiffs refer to Licensing Rules 201, 301, and 315, and their requirements pertaining to LGBT topics as the "Policy."

<u>The Wuotis and the Gantts</u>

Brian and Kaitlyn (Katy) Wuoti are Christians. JA115. Inspired by their faith, they felt called to adoption "after hearing about Vermont's dire need." JA116–17. They decided to pursue adoption through the Department—their "only option … because of costs." JA117. In 2014, before they had completed the licensing process, they became parents to a four-month-old. They eventually adopted this baby boy and his half-brother, in addition to having three biological children. JA115, 119.

Bryan and Rebecca Gantt are also Christians. JA133. After having four biological children, they too felt called to adoption and foster care, particularly for children with special needs. JA134–36. In 2016, shortly after starting the application process, the Department asked them to take a child "on an emergency basis." JA135. "[W]ithin days" they became foster parents to a young child "born with neonatal abstinence syndrome" from exposure to opiates in the womb. JA135. They eventually adopted two boys and also one girl "born with drug dependence." JA136.

The Wuotis and the Gantts have always been willing to love and accept any foster child "unconditionally," regardless of what the child

10

believes or how the child identifies. JA124, 145. They treat every child with dignity and respect and would never treat a child differently (much less belittle or reject a child) because the child identified as LGBT. JA124–26, 145–47.

Plaintiffs also want to remain true to their religious convictions. Both Brian Wuoti and Michael Gantt are pastors. JA115, 133. They attend church services on Sunday and do Bible studies at home. JA115, 133–34. As pastors, Revs. Wuoti and Gantt teach the Christian Scriptures, including passages about sex, gender, and our human identity. JA129, 144. They believe that "God created all people in his image as male and female," that "sex is binary and fixed," and that a person cannot change his sex or gender. JA122, 142.

In accordance with their beliefs, there are some things the Wuotis and the Gantts cannot say or do. They cannot use "pronouns that do not accord with a child's sex," or "other non-binary pronouns like 'they/them,' or 'ze/zir.'" JA128, 143. They also cannot display pride flags in their home, attend pride parades with their children, or "encourage a child to reject their God-given identity." JA144, 152. And while they would never force their religious beliefs on a child, they want to openly and honestly share their religious beliefs when conversations about the Bible, relationships, sex, or gender naturally come up. JA125, 144–45. They would "tailor" their speech according to the child's age, maturity, and openness to hearing about their beliefs. JA150, *see also* JA126. And

they would always remain respectful, never seeking to impose their beliefs while also staying true to their faith.

The Department revokes the Wuotis' and the Gantts' licenses

The Wuotis and the Gantts had successful histories as foster parents. Social workers described the Wuotis as "AMAZING," "wonderful," and "never a single concern." JA120–21. One supervisor stated: "I probably could not hand pick a more wonderful foster family." JA121. Social workers similarly described the Gantts as "wonderful," "amazing," "100% confidence," and "I hope we continue to find more families like [theirs]." JA136–37.

In May 2021, the Wuotis applied to renew their license. JA120. During the renewal process, Christopher Murphy, a Department official, asked the Wuotis to rate, on a scale from one to five, whether they agreed that their "family would be accepting and supportive of an LGBTQ foster child." JA120–21, 235. Brian and Kaitlyn put a "three." JA122, 234. Murphy asked "what might be needed to increase that answer to a 4 or 5." JA235. The Wuotis responded by explaining their religious beliefs on these topics. JA234. They stated that they would love and accept any child, but they also could not encourage a child to pursue same-sex romantic behavior or to "transition[]" to the opposite gender. JA234, *see also* JA218. This disclosure came from a place of vulnerability, not judgment. Katy Wuoti experienced gender dysphoria growing up and knows firsthand how difficult it can be. JA123–24.

12

Nevertheless, the Department revoked their license citing Rules 201.2 and 301. JA217–18. The Wuotis filed an administrative appeal. JA127, *see also* JA409. Vermont's Human Services Board upheld the revocation, acknowledging that "it is undisputed that petitioners are warm, loving, kind, and respectful people who have a history of parenting foster children without raising any concerns." JA429.

In September 2023, the Department asked the Gantts if they would foster a boy soon-to-be-born to a woman suffering drug addiction. JA140. The Department told the Gantts they would be "the most qualified" and "the unanimous choice" for this child. JA140. A few days later, the Gantts received an email stating that "Eligibility for licensure is dependent on … support[ing] youth who identify as … (LGBTQI+) even if the foster parents hold divergent personal opinions or beliefs." JA070, 140. The Gantts conveyed that they would take the baby boy. JA148. They also expressed concern about the Department's new policy. JA148. Later, the Gantts spoke to Murphy—the same licensor who revoked the Wuotis. JA149. The Gantts explained that they would love any child no matter how they identified but could not use inaccurate pronouns or take children to pride parades because of their faith. JA149. The Department told the Gantts they could no longer foster, and it revoked their license citing Rules 301 and 315 and Policy 76. JA150, 221–23. The revocation letter stated that the Gantts could "meet the

needs of some foster children, [but] rule 301 requires licensees to meet the 'needs of *each* foster child.'" JA223.

The proceedings below

Plaintiffs sued Department officials in June 2024, arguing that Vermont's Policy violated their free-speech, free-association, free-exercise, and due-process rights. JA018–19. They quickly sought a preliminary injunction against Vermont's Policy before the Honorable Judge William K. Sessions, III. JA073.

The district court denied their motion. *See* SA001–30. First, it held that Vermont's Policy regulated conduct, and any speech regulation is "at most incidental to rules of conduct designed to promote healthy and affirming homes." SA016. The court also held there was no burden Plaintiffs' expressive association. SA017–19.

Second, the court held that Vermont's Policy was neutral and generally applicable. SA019–24. It dismissed the significance of Vermont's individualized licensing process because Vermont does not grant formal variances for some of the Rules cited against Plaintiffs. SA023. It further held that Vermont did not disfavor any religious practices because the Policy "focused on Plaintiffs' respective abilities to comply with the Rules, regardless of the reasons underlying Plaintiffs' objections." SA023–24.

Third, the court held that while strict scrutiny did not apply, Vermont still satisfied it. SA025–27. It dismissed less-restrictive

14

alternatives like the federal government's—i.e., allowing LGBT children to choose homes that share their views—because a child could "post-placement, change their sexual identity," and then "a family that is unwilling to provide the support mandated by DCF would no longer be a suitable placement[.]" SA026–27.

Fourth, the court found that the Policy was not vague and that "DCF requirements on acceptance of gender identity are clear and consistent." SA029.

## STANDARD OF REVIEW

This Court "review[s] the denial of a motion for a preliminary injunction for abuse of discretion." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 180 (2d Cir. 2020). That occurs when the district court applied an "an incorrect legal standard or … a clearly erroneous assessment of the facts." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). Questions of law are reviewed de novo. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020). And because this appeal raises First Amendment claims, this Court also "review[s] the core constitutional facts de novo." *A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021).

## SUMMARY OF THE ARGUMENT

Vermont's Policy conditions Plaintiffs' participation in foster care on their willingness to speak and act against their faith. Vermont

requires families to agree to use words like chosen pronouns, to attend events like pride parades, and to verbally encourage a child's gender expression. Families who disagree are categorically excluded. This puts Plaintiffs to a choice between staying true to their religious beliefs or losing their foster license—and the chance to help foster children.

This Policy violates Plaintiffs' free-speech rights. It compels their speech by forcing them to speak approved messages about sex and gender. And it restricts their speech by prohibiting them from expressing their religious views on these topics. Viewpoint discrimination like this is presumptively unconstitutional and triggers strict scrutiny. Yet the district court erroneously held that Vermont regulated Plaintiffs' conduct, not speech. That nullifies the First Amendment and opens the door to rank discrimination against families who disagree with Vermont's ideological views.

Vermont's Policy also violates Plaintiffs' free-exercise rights. Vermont grants exemptions to comparable secular conduct that undermine its asserted interests all the time. And it employs a system of individualized assessments that invite enforcement officials to discriminate. Vermont's Policy is neither generally applicable nor neutral.

Because Vermont's Policy regulates speech based on viewpoint and substantially burdens Plaintiffs' religious exercise in a manner that is not generally applicable or neutral, it is subject to strict scrutiny. And

16

it fails under this exacting standard. Indeed, it fails *any* level of heightened scrutiny. It harms, rather than helps children in "[d]esperate need" of a home. JA064. Vermont's foster-care system is currently in "crisis," without enough foster families to care for children in need. JA064. Yet the Policy excludes Plaintiffs merely because of their religious views, not because they're bad parents. And it does so despite the fact that both the federal government and other states protect families who share Plaintiffs' religious beliefs while simultaneously providing for any unique needs that LGBT children may have. Vermont could do the same, especially when Vermont never proved that forcing foster applicants to affirm its preferred views actually promotes children's mental health or wellbeing.

## ARGUMENT

Plaintiffs deserve a preliminary injunction. Vermont regulates Plaintiffs' speech based on viewpoint and burdens their religious exercise through a policy that is neither neutral nor generally applicable. These First Amendment infringements trigger strict scrutiny, and the Policy fails any level of heightened review. Because Plaintiffs are likely to succeed on the merits and readily satisfy the remaining injunction factors, this Court should reverse.

I.    **Vermont compels and restricts Plaintiffs' speech based on viewpoint.**

The Policy compels Plaintiffs to speak ideological messages about sexual and gender identities while restricting Plaintiffs' speech expressing their religious beliefs on these topics. This regulates their speech, not conduct. And because the Policy burdens protected speech based on viewpoint, strict scrutiny applies.

   A.    **Vermont compels Plaintiffs' speech based on viewpoint.**

"[T]he government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). This is especially true when those messages "compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). The "fundamental rule" is that "a speaker has the autonomy to choose the content of his own message." *Id.* It is not for the State to decide "what to say and what to leave unsaid." *Id.* (cleaned up).

Here, it's undisputed that Plaintiffs lost their licenses because they would not speak the State's message about gender identity and sexual orientation. Specifically, the State sought to compel Plaintiffs to "use a transgender foster child's preferred name or pronouns" and to share unequivocally affirming messages regarding a child's sexual and gender expression. JA221; *see also* JA289 (conceding the Policy requires

Plaintiffs to "say … certain things, like respecting a child's chosen pronouns.…").

Start with pronouns. After the Gantts were foster parents for years, they received the State's email explaining that parents must be "fully embracing and holistically affirming" of children's gender expression, "even if the foster parents hold divergent personal opinions or beliefs." JA070–71; 140–41. The Gantts politely explained that they would "unconditionally love and support any child," but could not "affirm behaviors, beliefs, or ideas that go against [their] religious convictions (like using any [preferred] pronoun a child wants ….)." JA222. In response, Vermont revoked their license. JA221–23.

Beyond pronouns, the Policy seeks to compel speech that actively encourages certain behaviors and choices over others. Plaintiffs must speak "positive" messages encouraging a child's gender expression. *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019); *e.g.*, Rule 315 (SA044). So when the Wuotis explained that they could not "encourage a child to pursue" same-sex romantic behavior or to "transition[]," the State revoked their license. JA217–18.

To make matters worse, Vermont's effort to compel speech also discriminates based on viewpoint—"an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Vermont requires parents to promote one view of the gender-identity debate: that males can be girls, females can be boys,

19

and gender is fluid. The Wuotis and the Gantts disagree. JA122, 142. Yet Vermont requires them to speak against their beliefs, forcing them "to 'utter what is not in [their] mind' about a question of political and religious significance." *303 Creative*, 600 U.S. at 596 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943)). That is "something the First Amendment does not tolerate." *Id.*

### B. Vermont restricts Plaintiffs' speech based on viewpoint.

The Policy also *prohibits* Plaintiffs from expressing their views on certain topics at all. As Vermont concedes, the Policy "require[s] Plaintiffs to … refrain from saying certain things, like … refraining from trying to impose certain views on a child," or expressing certain views about "homosexuality." JA289.

Consider Rule 315: parents "*shall* support children in wearing hairstyles, clothing, and accessories affirming of the child's … gender identity." (emphasis added). SA044. Few parents allow their children to wear whatever they want whenever they want. Yet *only* in this context does Vermont require unwavering support. This prohibits parents from politely expressing disagreement or even gently dissuading a child from wearing certain clothes or hairstyles (even if they ultimately allow it). Thus, when the Wuotis disclosed that they intended to engage in speech that "would encourage (not force)" a child to embrace and live

consistently with God's design for sex and the human body, Vermont revoked their license. JA218, 234.

The Policy restricts Plaintiffs' speech "based on the ideas or opinions it conveys." *Iancu*, 588 U.S. at 393. They cannot state that sex is immutable because Vermont labels this view "offensive" and "derogatory." *Id.* In Vermont, "only one perspective" about a controversial and much debated topic is "acceptable." *Husain v. Springer*, 494 F.3d 108, 127 (2d Cir. 2007).

### C.  When a policy applies to speakers based on their message, it regulates speech and not conduct.

Rather than justify its "blatant[ly]" unconstitutional viewpoint-based regulation of Plaintiffs' speech, *Rosenberger*, 515 U.S. at 829, Vermont engages in a game of semantics. It calls Plaintiffs' speech conduct and argues any burden on speech is merely incidental. The district court agreed. SA015–17. But the "State cannot foreclose the exercise of constitutional rights by mere labels." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429 (1963). A policy may facially regulate conduct while regulating speech in application. And the State has many tools at its disposal to protect children without silencing viewpoints it doesn't like.

1. Vermont's Policy requires speech. Take Rule 315. It says parents "shall support" a child's clothing and hairstyle choices. To "support" means to "defend as valid, right, just," to "advocate" for, or "to

21

actively promote the interests or cause of." *Support*, Webster's Third New Int'l Dictionary 2297 (1993). These activities are nearly impossible to do without speech. *See United States v. Miselis*, 972 F.3d 518, 536–37 (4th Cir. 2020) (enjoining ban on promoting or encouraging a riot by looking to dictionary definitions equating promote and support).

Moreover, Vermont ignores that a policy may "*generally* function[] as a regulation of conduct," while still regulating speech "as applied to plaintiffs." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 27–28 (2010). A policy *compels* speech when it forces someone to "alter" their "expressive content." *Hurley*, 515 U.S. at 572. And a policy *restricts* speech when the "triggering" event "consists of communicating a message." *Holder*, 561 U.S. at 28. In either case, courts have to "ask whether the message matters" to whether the regulation applies. *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1278 (11th Cir. 2024).

The Supreme Court's caselaw on free speech and public-accommodations laws shows how facially neutral laws can compel speech in application. Public-accommodations laws, like foster-care licensing requirements, don't typically "target speech." *Hurley*, 515 U.S. at 572. But they still infringe on free-speech rights when applied to force a private group to include an LGBT banner in a parade, *id.* at 573, or to force artists to design wedding websites celebrating same-sex marriages, *303 Creative*, 600 U.S. at 589; *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000) (applying public-accommodations law to

force Boy Scouts to include scoutmaster was more than "an incidental effect on protected speech").

This Court applied the same test in *New Hope*, where New York tried closing down a Christian adoption agency because it would not certify same-sex couples in contravention of its religious beliefs. 966 F.3d at 149. New York floated the same conduct-not-speech argument, but this Court rejected it, recognizing that the agency's purported conduct—namely, its counseling, instruction, and evaluation of adoption applicants—was "laden with speech." *Id.* at 171. Indeed, the agency's entire purpose was to "speak" about the best interests of the child. *Id.* Those facts were sufficient to find that forcing the agency to certify same-sex couples compelled it to communicate a message it did not agree with: "that adoption by unmarried or same-sex couples would ever be in the best interests of a child." *Id.* This case is even easier than *New Hope* because Vermont forces Plaintiffs to speak actual words conveying objectionable ideas.

It's the same principle in reverse when a regulation restricts speech. For example, laws against materially supporting terrorists target conduct. *Holder*, 561 U.S. at 26 ("'material support' … most often does not take the form of speech at all"). But as applied to lawyers giving legal advice, it "regulates speech on the basis of its content." *Id.* at 27. Laws against disturbing the peace similarly aim at "offensive conduct." *Cohen v. California*, 403 U.S. 15, 17 (1971). But as applied to

23

punish someone for expressing his views, they restrict speech "for the underlying content of the message." *Id.* at 18 ("The only 'conduct' which the State sought to punish is the fact of communication.").

These principles control here. Vermont seeks to use its Policy to regulate speech under the guise of banning harmful conduct. But a law targeting harms "caused by a distinctive idea, conveyed by a distinctive message," really aims "to handicap the expression of particular ideas." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 393–94 (1992). Like the laws in *303 Creative* and *Hurley*, the Policy forces Plaintiffs to communicate a message with which they disagree. And like the laws in *Holder* and *Cohen*, it restricts Plaintiffs' speech because of the message they want to express. These cases make clear that, as applied, the Policy aims at speech and is subject to First Amendment scrutiny.

Ignoring this binding Supreme Court precedent, the district court relied instead on *Bates v. Pakseresht*. No. 2:23-CV-00474-AN, 2023 WL 7546002, at *16 (D. Or. Nov. 14, 2023); *see* SA015. But *Bates* rejected Vermont's logic. It held that forcing a would-be adoptive parent to use chosen pronouns compelled speech in a way "similar to the plaintiffs in *Barnette* and *303 Creative*." *Bates*, 2023 WL 7546002, at *17. "As applied," the policy in *Bates* compelled and restricted speech about sex and gender—just like Vermont's. *Id.* at *18.

Vermont requires speech solely to promote an ideological message, not to further "any separately identifiable conduct." *Cohen*, 403 U.S.

24

at 18. Indeed, words like "pronouns can and do convey a powerful message" about human identity and sexuality. *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021). So compelling speech "on weighty issues" like these is "no mere 'incidental' infringement on First Amendment rights." *303 Creative*, 600 U.S. at 599–600 (cleaned up). Similarly, "Plaintiffs want to speak … and whether they may do so … depends on what they say." *Holder*, 561 U.S. at 27. Vermont's Policy therefore directly regulates Plaintiffs' speech, not merely their conduct.

2. The district court also fretted that a ruling for Plaintiffs would handicap Vermont's ability to prohibit "potentially harmful" conduct like "foul or abusive language" or parents "[e]spousing the superiority of their own religious practices." SA016–17. Not so.

Vermont can protect children without restricting speech based on viewpoint. For example, it can prohibit foul, vulgar, or abusive speech by regulating the form, mode, or manner of speech. *Iancu*, 588 U.S. at 401 (Roberts, J., concurring) ("refusing registration to obscene, vulgar, or profane marks does not offend the First Amendment"); *cf. Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986) (approving regulation on "offensively lewd and indecent speech" that was "unrelated to any political viewpoint"); *accord, e.g.*, 26 Tex. Admin. Code § 749.1003 (prohibiting "remarks that belittle or ridicule the child or the child's family"). In fact, it already does. Rules 324 and 325 require discipline that's "constructive," not "cruel" or "degrading." SA045. And Rule 338

requires parents to "respect the religious beliefs and cultural heritage of foster children." SA047. These restrictions prohibit the harmful speech the district court fears without muzzling respectful conversations about religion, sexuality, and gender based on viewpoint. The Policy, in stark contrast, prohibits such conversations no matter how polite and consensual they are.

The First Amendment protects prospective foster families of all viewpoints. To exempt foster care licensing from the First Amendment would hand states a blank check to discriminate. States of a different ideological leaning could require parents to use biologically accurate pronouns. *See Meriwether*, 992 F.3d at 506 (making similar point in university context). States could similarly prohibit caregivers from exposing kids to books, movies, and events promoting progressive views about gender and sex. Vermont's argument has no logical limit and finds no support in the relevant case law.

## II. Vermont burdens Plaintiffs' religious exercise via a policy that is not neutral or generally applicable.

Vermont has violated Plaintiffs' free-exercise rights because it "burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 597 U.S. at 525 (citation omitted). There's no doubt that putting religious observers "to a choice" between "participat[ing] in an otherwise available benefit," or staying true to their religious faith, is a burden on their religious

exercise. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017). And here, Plaintiffs "may participate … only if they disavow their religious beliefs." *Blais v. Hunter*, 493 F. Supp. 3d 984, 1000 (E.D. Wash. 2020).

Nor is the Policy "applied in an evenhanded, across-the-board" manner. *Kennedy*, 597 U.S. at 527. Vermont regularly treats "comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). It employs formal exemptions of the sort condemned in *Fulton v. City of Philadelphia*, while allowing standardless individualized assessments that give enforcement officials unbridled discretion to discriminate. 593 U.S. 522, 537 (2021). This uneven playing field tilted against religious beliefs triggers the "strictest scrutiny." *Id.* at 541.

## A. Vermont's many exemptions treat religious exercise worse than comparable secular conduct.

A law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. This destroys neutrality too because it "devalues religious reasons … judging them to be of lesser import." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537–38 (1993); *see also id.* at 531 ("Neutrality and general applicability are interrelated[.]").

Vermont grants exemptions that undermine its interests on many fronts. Start with Vermont's purported interest in requiring *all* "licensees to meet the 'needs of *each* foster child.'" JA223. Below, Vermont insisted that it applied this policy evenhandedly, requiring families to treat an LGBT child "*the same way* it requires them to treat children of a different race or religious background respectfully." JA302 (emphasis added); *see also* JA292 (explaining the Policy requires that families "not reject or diminish any aspect of a child's identity, whether that be racial, cultural, sexual, or gender").

Yet Vermont concedes that it does not require families "to support and encourage a child's religious faith or identity" in a way that forces them "to compromise their own beliefs[.]" JA290. Nor could it, since "a government official has no authority to require a religious act." *Doe v. Phillips*, 81 F.3d 1204, 1210 (2d Cir. 1996). Imagine forcing a Muslim family to erect a Hindu shrine or forcing an atheist to verbally affirm that God is real. *Cf. In re Adoption of E*, 279 A.2d at 789. Everyone understands these actions would violate the First Amendment.

Forcing the Wuotis and Gantts to verbally affirm ideas or behaviors that violate their faith is no different. Only in the LGBT context must families be "holistically affirming and supporting" of a child's interests, "even if [they] hold divergent personal opinions or beliefs." JA070–71. That treats Plaintiffs' religious exercise worse than

28

"analogous nonreligious conduct." *Williams v. Annucci*, 895 F.3d 180, 189 (2d Cir. 2018).

The district court also credited the State's non-discrimination interest (SA028), even as Vermont carves out sweeping exemptions that hollow it out. For example, the State allows parents to decline to "care for certain categories of children," like children of a certain age or sex, or children with physical or mental disabilities. JA302, *see also* JA033, 179–81. In fact, parents can decline children at the placement stage for *any* reason, like believing a child is just not a good fit. JA181. If families can decline to take kids based on age, disability, "gender, … or faith"— all of which "pose an identical risk to the [Department's] stated interest"— surely the Department can accommodate Plaintiffs. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 689 (9th Cir. 2023) (*FCA*). They will love any child, they just do not want to violate their faith.

Vermont's Policy, and the Licensing Rules more broadly, also promote safety, dignity, and having every child's individualized needs met. *E.g.*, JA160. Yet under Rule 35, Vermont may "grant a variance from a specific rule" whenever the Department thinks a "licensee will otherwise meet the goal of the rule." SA037. That allows Vermont to exempt all manner of regulatory requirements related to safe home environments, appropriate care, even discipline. *See generally* Rules 35, 301–15, 324–28. Rules protecting children's physical safety are at least

as important as the Rules Plaintiffs purportedly violated here. Perhaps worst of all, Vermont places children in "unlicensed, unregulated place[s]" like police stations and hotels. Add.008. Yet it inexplicably excludes families like Plaintiffs who could help divert children from these traumatic placements. These gaping holes make the Policy "substantially underinclusive." *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014).

The district court ignored all these exemptions that undermine the State's interests, holding that compliance hinged on Plaintiffs' "respective abilities to comply with the Rules, regardless of the reasons underlying Plaintiffs' objections." SA023–24. But a policy that treats "*any* comparable secular activity more favorably than religious exercise" is not generally applicable or neutral. *Tandon*, 593 U.S. at 62 (emphasis in original). And comparability in this context turns on "the risks various activities pose, not the reasons why people [undertake them]." *Id.* COVID-19 restrictions on houses of worship aren't generally applicable just because they apply to all "non-essential" activities. *Agudath Israel*, 983 F.3d at 632. And an all-comers policy applied to student groups isn't generally applicable when groups can still discriminate based on other criteria. *FCA*, 82 F.4th at 688 (discussing exceptions allowing exclusion "based on attributes such as good character").

The State cannot cabin the free-exercise inquiry to just the Policy either. In *Lukumi*, for example, the Court looked "outside the scope of the [challenged] ordinances" to scrutinize a prohibition on animal sacrifice. 508 U.S. at 545. And it found many unregulated activities that created similar risks to animal welfare or health concerns from the "improper disposal of animal carcasses," like hunting, fishing, pest control, even restaurant garbage disposal. *Id.* at 543–44. That made the law "underinclusive for those ends." *Id.* at 543; *accord Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 801 (2011) (holding law prohibiting sale of violent video games to minors was underinclusive for failing to regulate "Saturday morning cartoons").

In other words, states can't arbitrarily decide which activities pose a risk to their interests. So allowing families to turn away children for practical reasons, conscience-based reasons, or intuitive this-is-not-a-good-fit reasons equally undercut Vermont's stated policy of requiring families to meet the "needs of *each* foster child." JA223; *see also* SA043. And allowing families to turn away children because of their age, sex, or disability similarly undermines its nondiscrimination interests. "[C]ategories of selection" can—and often do—make a policy underinclusive. *Lukumi*, 508 U.S. at 542. And Vermont's Rules are riddled with holes that undermine the State's interests everywhere.

31

### B. Vermont allows individualized assessments.

"A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (cleaned up). *Fulton* held that Philadelphia could not condition a Catholic adoption agency's contract with the city on its willingness to certify same-sex couples against its Catholic beliefs. *Id.* at 532. The city's antidiscrimination policy was not generally applicable because it allowed discretionary exemptions. *Id.* at 535.

Vermont similarly has a "formal mechanism for granting exceptions." *Id.* at 537. Licensing Rule 35 allows the State to "grant a variance from a specific rule" whenever the Department thinks a "licensee will otherwise meet the goal of the rule." The district court held no variance was available for the specific Rules at issue in this case. SA023. But that's incorrect because Rule 35 permits variances to Rule 301, which was cited against both Plaintiffs. *See* SA037. That is decisive because it "invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537 (cleaned up). And Vermont cannot "refuse to extend that exemption system to cases of religious hardship without compelling reason." *Id.* at 535 (cleaned up).

The Policy allows informal, individualized exemptions too. *Fulton* condemned discretion to grant exemptions "regardless whether any

exceptions have been given." *Id.* at 537. It did not matter that a separate contractual provision "independently prohibit[ed] discrimination in the certification of foster parents." *Id.* So *Fulton* was concerned with governments having the *ability* to disfavor religious exercise, even if it never happened in practice.

Vermont's discretion-filled Policy gives enforcement officials unbridled discretion to discriminate against religion in many places. For example, Rule 201 requires assessing whether a parent has "[h]ealthy" relationships, "[k]nowledge of child and adolescent development," "[s]ound judgment," and "[s]table" emotions. SA041. And Rule 301 requires parents to show they can "meet the physical, emotional, developmental and educational needs of each foster child[.]" SA043. These assessments are highly subjective and rendered on a case-by-case basis in the licensor's sole discretion.

Other courts agree that these types of "subjective assessment[s]" are "a distinctive feature of the foster care licensing process" and that they raise free-exercise concerns. *Blais*, 493 F. Supp. 3d at 999. In *Blais*, the court held that "holistic assessment[s]" like Vermont's are not generally applicable. *Id.* And in *Burke v. Walsh*, the court even held it was "clearly established" that a materially identical policy was not generally applicable because it vested state officials with the "discretion . . . to decide how and when to apply the various subjective criteria" required for these "individualized and discretionary assessment[s]." No.

33

23-11798, 2024 WL 3548759, at *7–8 (D. Mass. June 5, 2024) (evaluating rule requiring parents "to promote the physical, mental, and emotional well-being of a child placed in his or her care, including supporting and respecting a child's sexual orientation or gender identity") (cleaned up). Vermont's subjective criteria for satisfying their licensing rules are likewise not generally applicable.

The district court disagreed, reasoning that "[n]o exemption is applicable" to Rules 200, 201, or 315. SA023. But this ignores that rules with "so much discretion … and so few standards" necessarily invite discrimination. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 290 n.29 (2d Cir.) (per curiam), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021). After all, "the general principle [is] that greater discretion … makes the action … more, not less, constitutionally suspect." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004) (holding that a "'system of individualized exemptions' need not be a written policy, but rather the plaintiff may show a pattern of ad hoc discretionary decisions amounting to a 'system'"). To ignore this principle would incentivize states to nominally prohibit "exemptions" while enacting vague and subjective rules insulated from First Amendment scrutiny. That would contradict the logic of *Fulton* and give states a blueprint for skirting the First Amendment.

***

For all these reasons, Vermont's Policy infringes on First Amendment rights, and the district court erred in applying rational basis when it should have applied strict scrutiny.

## III. Vermont's Policy fails any level of heightened scrutiny.

Strict scrutiny requires a policy to advance "a compelling governmental interest" through "narrowly tailored" means. *Lukumi*, 508 U.S. at 531–32. But Vermont's Policy is unsure of its goals and careless in its reach: it does not promote the interests of *all* foster children, it prefers a blunt instrument to less-restrictive means, and it is built on an ideological rather than evidence-based foundation. This fails any level of heightened scrutiny. *See Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014) (explaining intermediate scrutiny requires laws to "directly advance[] a substantial governmental interest" and not be "overly restrictive").

### A. The Policy does not advance a compelling government interest.

Vermont's Policy must advance "interests of the highest order." *Fulton*, 593 U.S. at 541 (cleaned up). And those interests must support "*each application*" of its policy. *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 478 (2007) (opinion of Roberts, C.J.). So while Vermont's sweeping invocations of safety, health, and dignity may sound compelling at a "high level of generality," strict scrutiny requires more. *Fulton*, 593 U.S.

35

at 541. Vermont must show that "denying an exception to" Plaintiffs directly advances its goals. *Id.*

As applied here, the Policy does not advance *any* legitimate interest. The Policy excludes Plaintiffs merely because of their views, not their parenting style. And this arbitrary exclusion reduces the pool of loving foster families, harming rather than helping the children Vermont is supposed to protect.

### 1. Silencing disfavored viewpoints is not a legitimate, much less compelling interest.

The "government may not prohibit the expression of an idea simply because" the government disagrees with it. *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Even when states invoke their power to protect children, they do not have "a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. Viewpoint discrimination is so antithetical to the First Amendment that it's nearly always unconstitutional. *Iancu*, 588 U.S. at 393 ("Viewpoint discrimination doomed the [law]."); *Rosenberger*, 515 U.S. at 829 (viewpoint discrimination was a "blatant" First Amendment violation).

An underinclusive policy can also reveal the State's "special hostility" to certain viewpoints. *R.A.V.*, 505 U.S. at 396. In *R.A.V.*, for example, the Court struck down a ban on bias-motivated cross burnings because the law applied only to certain messages. *Id.* at 391–92. St. Paul asserted an interest like Vermont's in protecting vulnerable

36

populations from offensive messages considered especially harmful. *Id.* at 392. But it only prohibited expression on some topics ("race, color, creed, religion or gender") and not others (like "political affiliation, union membership, or homosexuality"). *Id.* at 391. That was fatal, because a law "not limited to the favored topics" could achieve the same goals without "handicap[ing] the expression of particular ideas." *Id.* at 394, 396.

Vermont's Policy similarly targets ideas through "selective limitations upon speech." *Id.* at 392. It prohibits foster parents from sharing certain religious beliefs, no matter how respectful and polite the conversation is. If it's not fully supportive on LGBT issues, it's not allowed, ever. Yet the Department accommodates comparable conflicts of conscience in other contexts. *Supra* § II.A. Indeed, Vermont does not require foster parents to agree to refrain from sharing their progressive political beliefs or expressing their secular worldviews, even though Vermont concedes that its interests are to support to *every* child's unique identity "the same way." JA302 (conceding the Policy applies "the same way" to "children of a different race or religious background"); *see also* Rule 338 (SA047) (requiring respect for religious and cultural identities). This type of "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 801–02.

And while viewpoint-based speech restrictions are bad enough, compelling speech based on viewpoint is worse because it coerces individuals "into betraying their convictions." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892–93 (2018). So forcing schoolchildren to recite the pledge of allegiance impermissibly "coerce[d] acceptance of [a government] creed." *Barnette*, 319 U.S. at 634. And forcing artists and parades to include pro-LGBT messages forced them "to propound a particular point of view" and violated their "autonomy to control [their] own speech." *Hurley*, 515 U.S. at 574–75; *303 Creative*, 600 U.S. at 598. No state interest—including a dignitary interest—justifies compelling or restricting speech contrary to conscience. *303 Creative*, 600 U.S. at 590; *Hurley*, 515 U.S. at 574, 578–79.

Vermont's Policy treads this forbidden ground. It forces Plaintiffs "to speak contrary to [their] beliefs on a significant issue of personal conviction, all in order to eliminate ideas that differ from [Vermont's] own." *303 Creative*, 600 U.S. at 598. And it compels speech on only *one* topic even though its Policy applies equally to all children. Vermont's goals echo past attempts to "coerce uniformity of sentiment in support of some end thought essential." *Barnette*, 319 U.S. at 640. But "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Janus*, 585 U.S. at 893.

38

## 2. Arbitrarily excluding families worsens the foster-care "crisis."

Excluding Plaintiffs does not serve Vermont's children either. Vermont currently faces a "placement crisis." JA259. It does not have "enough homes and supports to fill the need." JA259. This has led to the practice of "staffing,"—keeping foster children in police stations, hotels, or other institutional placements that are isolating and harmful. Add.008. This shortage shows Vermont's interest in maximizing its pool of licensed foster families at the certification stage. That maximizes the chances a child can find a loving home, averting the need for "unlicensed, unregulated" placements that are "[t]raumatizing." Add.008.

Vermont also has the "responsibility to ensure *all* children" have "caregivers who are committed to fully embracing and holistically affirming and supporting them regardless of their sexual orientation or gender identity." JA071 (emphasis added). And Policy 76's purpose is "[t]o provide a safe, healthy, and inclusive environment for *all* children and youth served by the division." JA160 (emphasis added); *see also* Rule 338 (SA047). This means Vermont requires a deep and diverse pool of foster parents so that each child can be supported in their unique religious, cultural, or ethnic identity. *See also* JA302 (arguing Vermont's Policy applies "the same way" to support children's racial or "religious background").

39

Yet Vermont's Policy harms its interests by arbitrarily reducing the pool of licensed foster homes. It's like the discriminatory policy in *Fulton*, where Philadelphia refused to work with a Catholic adoption agency because of its religious objections to certifying same-sex couples. 593 U.S. at 531. The City defended its policy by claiming it maximized the pool of foster families. *Id.* at 541. But the Court found that claim implausible because including the agency as a provider would "likely … increase … the number of available foster parents." *Id.* at 542.

Conversely, excluding families based on widely held religious beliefs "would be devastating to the foster care system." David M. Smolin, *Kids Are Not Cakes: A Children's Rights Perspective on Fulton v. City of Philadelphia*, 52 Cumb. L. Rev. 79, 149–50 (2022) (estimating effect based on polling data on LGBT topics). A policy that undermines the State's true interests fails any level of heightened scrutiny. *Alexander v. Cahill*, 598 F.3d 79, 91–92 (2d Cir. 2010) (intermediate scrutiny requires policy to "materially advance" state's interests). Vermont "apparently prefers to risk leaving children without foster parents than to allow" in families like the Wuotis and the Gantts. *Fulton*, 593 U.S. at 550 (Alito, J., concurring).

The district court dismissed concerns about excluding religious families, reasoning that Vermont does not compel them "to change or reject their beliefs." SA026. But this non-sequitur ignores how Vermont's Policy forces families to speak a "holistically affirming"

40

message, while also requiring them to bridle their tongue. JA071; *supra* § I.A–B. Vermont even told the Gantts they had to "shift [their] perspectives." JA253. And whether the Policy requires an "attitude of mind" or a simulation of "assent by words without belief," the result is the same. *Barnette*, 319 U.S. at 633. It forces individuals to "mouth support for views they find objectionable." *Janus*, 585 U.S. at 892. Vermont cannot force Plaintiffs to speak against and give up their religious views as a condition to participating in the program.[2]

## B. Vermont's Policy fails narrow tailoring.

Narrow tailoring requires precise means addressed to real harms. But rather than accommodating religious families like the federal government and other states do, Vermont opted for an ideological dragnet, indiscriminately sweeping up constitutional rights in the process. And it justified this ban based on speculative fears of harm it never proved and risks it never quantified. This blanket prohibition is the opposite of narrow tailoring.

---

[2] In the licensing and government-benefit context, the state can't condition a license or a benefit "on the surrender of a constitutional right." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 513 (1996) (liquor license); *Frost v. R.R. Comm'n of Cal.*, 271 U.S. 583, 593 (1926) (business license). And here, as in almost any other context, the viewpoint discrimination "doom[s]" Vermont's Policy. *Iancu*, 588 U.S. at 393.

### 1. Vermont ignores less-restrictive alternatives in favor of a prophylactic policy.

If "the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. In other words, Vermont must show that categorically excluding Plaintiffs is "actually necessary" to promote children's welfare. *Brown*, 564 U.S. at 799. But the facts and the law prove it is not. Plaintiffs are loving parents who would care for any children. Yet the Policy requires more—unqualified assent and support—only on LGBT topics, while accommodating comparable conflicts of conscience in other situations. The Supreme Court eschews prophylactic policies like Vermont's. Indeed, other states and the federal government manage to respect constitutional rights without any resulting harm to any children in foster care. This proves that Vermont can easily do so too.

a. Start with the undisputed facts: Plaintiffs are loving and kind parents who would care for any child. Even with Vermont's bias toward Plaintiffs' beliefs, the State concedes that they could "meet the needs of [at least] some foster children." JA223. They adopted five children from foster care. JA119, 135–36. Department officials previously described the Wuotis as an "AMAZING" and "wonderful foster family," who "would … offer warmth and compassion to any child who entered [their] home." JA120–21, 233. And when the Department needed someone to care for a soon-to-be-born baby with special needs, it declared the

Gantts "the unanimous choice," "the most qualified," the "perfect home." JA045, 140. The district court agreed: "both sets of Plaintiffs are capable of providing loving homes for many children." SA030.

This dispels any pretense of narrow tailoring because Plaintiffs could care for many children without any risk to Vermont's alleged interests. Vermont could match them with children who share the same faith tradition or attend the same church, or with infants and toddlers who don't yet know what "gender identity" or "sexual orientation" are.

Vermont could similarly issue licenses tailored to a family's strengths or weaknesses. It already accommodates families who can care only for children of a certain age or sex. JA033. It accommodates families who can't care for children with special needs or mental and physical disabilities. SA041; JA033. And it could easily license Plaintiffs for things like respite care, allowing them to relieve other caregivers who need a babysitter for a few days or weeks at a time—just "in case a family from [their] church or in [their] community has a need[.]" JA512. But Vermont doesn't allow any of this, barring Plaintiffs entirely from any form of foster care, "even if [their involvement in such care] does not result in" any risk to Vermont's interests. *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 116 (2d Cir. 2017) (finding prohibition on soliciting cars overbroad because it reached benign activities like "children selling lemonade"). That fails even intermediate scrutiny. *Id.*

43

b. Vermont never denied Plaintiffs' undisputed parenting qualifications but still declined to license them because they were not able to care for "*each*" (i.e. any) child. JA223; *see also* SA043. This is wrong because Plaintiffs would care for—and treat with dignity and respect—all kids. Regardless, no prospective parent is actually required to care for "each" (i.e. any) child. *Supra* § II.A–B (describing individualized and categorical exemptions). Consider a few examples. An atheist family may adopt an infant who, as a teenager, desires to become a Christian. Or a Muslim may adopt a toddler who later eschews all religion. Yet Vermont doesn't disqualify the atheist or the Muslim family unless they agree to participate in Christian events or affirm a child's atheistic beliefs. It is only *one* set of topics—gender identity and sexual orientation—where Vermont demands uniform ideology.

This "bespoke requirement" shows that the Policy is under-inclusive. *Kennedy*, 597 U.S. at 527. Vermont singles out one type of protected activity for disfavored treatment, while leaving comparable sources of harm untouched. *See supra* § II.A. This "cast[s] doubt on both whether the government's asserted interest is compelling and whether that policy actually is the least restrictive means" available. *Annucci*, 895 F.3d at 189. And this "is alone enough to defeat it." *Brown*, 564 U.S. at 802.

c. A "complete ban" also requires "each activity within the proscription's scope" to be "an appropriately targeted evil." *Frisby v. Schultz*, 487 U.S. 474, 485–86 (1988). In other words, governments can't prohibit constitutional activities to avoid hypothetical side effects. *Id.* (explaining "a possible byproduct" of an activity doesn't justify a "[c]omplete prohibition"). They can't prohibit all leafletting because it might result in some litter. *Schneider v. State of New Jersey*, 308 U.S. 147, 162 (1939) ("obvious methods of preventing littering" included "punishment of those who actually throw papers on the streets"). And they can't prohibit all street artists just because it might result in some congestion. *Bery v. City of New York*, 97 F.3d 689, 697 (2d Cir. 1996); *accord Oyster Bay*, 868 F.3d at 116 (same logic applied to invalidate ban on soliciting cars).

Here too, the mere possibility of parent-child mismatch can't justify a complete exclusion. After all, Vermont concedes that Plaintiffs' religious speech is not the "substantive evil" it seeks to prohibit. *Frisby*, 487 U.S. at 486 (cleaned up). Everyone agrees Plaintiffs are loving and kind parents. Everyone agrees they could care for a wide range of children. Vermont banned their speech just in case a hypothetical child, someday, somewhere, might not feel sufficiently supported. This type of "prophylactic, imprecise, and unduly burdensome rule" isn't even close to what the Constitution demands. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988).

45

d. Other federal and state policies prove that Vermont has other options. *See Ramirez v. Collier*, 595 U.S. 411, 429 (2022). Vermont must prove "that it considered different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

Foster-care regulations promulgated by the Biden Administration show that other approaches are available. *Designated Placement Requirements Under Titles IV-E and IV-B for LGBTQI+ Children*, 89 Fed. Reg. 34,818 (April 30, 2024) (codified at 45 C.F.R. § 1355). Those regulations recognize the "vital role that … families of faith play in the child welfare system." *Id.* at 34,840. They require all families to "be safe and appropriate for all children," but *without* requiring all families to tailor their care in ways that "may not be relevant or necessary for non-LGBTQI+ children." *Id.* at 34,819, 34,840. The regulations also recognize that a family's "particular views about sex and gender," or "respectful efforts to communicate with LGBTQ+ children about their status or identities," can't be disqualifying and in no way suggest that a family is "unsafe." *Id.* at 34,826–27, 34,840.

It's telling that other states would happily license families like Plaintiffs while sharing Vermont's interest in protecting the well-being and dignity of *all* foster children. Arkansas, Arizona, Idaho, Kansas, Mississippi, and Tennessee each have adopted laws explicitly protecting families from discrimination or exclusion because of their religious beliefs about sex and gender. *E.g.*, H.B. 1669, 95th Gen. Assemb., Reg.

Sess. (Ark. 2025) (prohibiting any "per se standard, rule, or policy" disqualifying foster or adoptive parents because of their "sincerely held religious beliefs regarding sexual orientation or gender identity").[3] "When a plausible, less restrictive alternative is offered … it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000). But Vermont did not do that here. That dooms its case.

### 2. Speculative fears can't justify certain constitutional burdens.

Vermont argues that anything narrower than a blanket rule would be insufficient because the State can't always know which

---

[3] *See also* Ariz. Rev. Stat. § 8-921 (prohibiting discrimination against any foster or adoptive parent who "intends to guide, instruct or raise a child in a manner consistent with the person's religious belief or exercise of religion"); Idaho Code § 16-1648 (same); H.B. 2311, 2025-2026 Reg. Sess. (Kan. 2025) (prohibiting any policy requiring foster parents "to affirm, accept or support any governmental policy regarding sexual orientation or gender identity that may conflict with the person's sincerely held religious or moral beliefs," and prohibiting exclusion based on those beliefs); Miss. Code. Ann. § 11-62-3, -5 (prohibiting discrimination against anyone who "intends to guide, instruct, or raise a child" consistent with their religious beliefs that sex is an "immutable" characteristic); Tenn. Code Ann. § 37-6-102 (prohibiting the state from requiring foster parents "to affirm, accept, or support any government policy regarding sexual orientation or gender identity that conflicts with the parent's sincerely held religious or moral beliefs"); *see also* Ga. Code Ann. § 49-5-281(a)(3) (protecting foster parents' rights to promote their "values and beliefs, so long as the values and beliefs of the foster child and the birth family are not infringed upon").

47

children identify as LGBT or predict which children will eventually identify that way. The district court similarly hypothesized that if a child grows up to be LGBT, families like Plaintiffs would "no longer be a suitable placement." SA026. While the premise that Plaintiffs can't care for LGBT children is flawed (more on that below), it fails on its own terms for at least four reasons.

**First**, the risk of future parent-child conflicts on issues of identity is unavoidable and omnipresent. An atheist may adopt a child who becomes religious. The religious family may adopt a child who becomes an atheist. Or a family unable to accommodate a child with special needs may suffer a tragedy that leaves their child disabled. These types of hypothetical events are often unknowable and unavoidable. Yet Vermont matches families to the best of its abilities and doesn't categorically exclude them because of conjectural future events. Only in this context does Vermont demand certainty, even though it offered no evidence that a child's hypothetical future sexual or gender identity will lead to any more intractable conflicts or failed placements than other types of unforeseeable future events.

**Second**, strict scrutiny demands precision, not guesswork. But Vermont never quantified the risk it seeks to avoid. While Vermont claimed that LGBT children are overrepresented in the foster-care system, it did not present any accurate or representative numbers about foster children in Vermont or elsewhere. And even Vermont's

48

flawed surveys showed that most children do not identify as LGBT. That shows Vermont's Policy has no "connection between the prohibited speech … and the asserted interest" in the majority of its applications. *Oyster Bay*, 868 F.3d at 115–16 (applying intermediate scrutiny).

Vermont did claim, without evidence, that "it is not possible to know which children are or will be LGBTQ." JA304. But that doesn't mean the odds of any child identifying as LGBT aren't quantifiable at all. *Cf. McCullen*, 573 U.S. at 494 (rejecting government's blanket assertion that it "tried other approaches"). Vermont makes much of how it purportedly engaged in a "data-driven policymaking process," JA295, but it never collected the most basic data, like how many children identify as LGBT in its system. It could collect data when children come into the system, track how many children initially identify or do not identify as LGBT, and then measure how many children so identified at 5- and 10-year intervals. Then it could look at demographic information and other data to see if there were any predictive variables. But it didn't attempt anything like that.

The State had tools; it chose not to use them. That failure leaves the Policy's reach unexamined and indefensible, even under intermediate scrutiny. *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 698 (6th Cir. 2016) (holding weapons ban on mentally ill persons failed intermediate scrutiny because lack of "longitudinal evidence" made it impossible to assess degree of overinclusivity).

49

Besides, Vermont worries about hypothetical harms when real harms are happening now. Vermont doesn't have enough families to care for the children in its system. Add.005, 008. So the question is whether the speculative risks here outweigh the certain harm of placing children in police stations and hotels. Vermont's conjecture doesn't satisfy any level of heightened scrutiny. *Cornelio v. Connecticut*, 32 F.4th 160, 171 (2d Cir. 2022) ("recited harms" must be "real, not merely conjectural," and regulation must "alleviate these harms in a direct and material way" (cleaned up)).

**Third**, the Constitution doesn't bend to a state's hypothetical fears. States, for example, can't suppress speech because of speculative concerns that an unwilling listener might hear and be offended by it. *Cf. Cohen*, 403 U.S. at 21 ("Of course, the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense."). That's the case, even when the speech enters the home. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 168 (2002) (door-to-door solicitation); *Martin v. City of Struthers*, 319 U.S. 141, 147 (1943) (same). Even "shielding children" from harmful content can't "support a blanket ban if the protection can be accomplished by a less restrictive alternative." *Playboy*, 529 U.S. at 814. The Court has "never held that the government itself can shut off the flow of [information] to protect

50

those recipients who might potentially be offended." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 72 (1983).

Similarly, in the child-welfare context, courts don't punish parents because their constitutionally protected speech, religious beliefs, or status might hurt a child's feelings. Rather, they apply typical strict-scrutiny review and require particularized showing of harm from a parent's religious exercise or protected speech. *E.g.*, *Zummo v. Zummo*, 574 A.2d 1130, 1157 (Pa. Super. Ct. 1990) (requiring "competent evidence" that parent's religious exercise would present a "substantial threat of present or future physical or emotional harm to the particular child or children involved").

For instance, courts have rejected attempts to penalize parents who object to blood transfusions without evidence that a particular child was "prone to accidents" or suffered an "affliction that might necessitate a blood transfusion in the near future." *Garrett v. Garrett*, 527 N.W.2d 213, 221 (Neb. Ct. App. 1995). And without individualized evidence that "religious practices regarding social activities" will harm a particular child, "the court may not use those beliefs to disqualify the parent." *Pater v. Pater*, 588 N.E.2d 794, 800 (Ohio 1992). Of course, this case is much easier than one arising in the child-custody context, because the State admits that it has no clue which children might object to Plaintiffs' religious speech and that its hypothetical fears only apply to an unknown minority of children.

51

*Doe v. County of Centre* is instructive. There, a family challenged a policy discriminating against them in foster care because their child had HIV. 242 F.3d 437, 441 (3d Cir. 2001). The government defended its policy much like Vermont is here, citing the hypothetical risk to other children and its need for a "blanket policy" because the risks were "deadly." *Id.* at 450–51. But the Third Circuit held the policy lacked "individualized" treatment, relying instead on "remote and speculative risk[s]," justifications that are insufficient under disability laws and the Constitution alike. *Id.* at 449–51. And it found many less-restrictive alternatives, like placing children based on their age, where the alleged risks of transmission were "next to zero." *Id.* at 451. The same is true here.

Vermont could also take a page out of the Biden Administration's playbook. Its Title IV-E and IV-B regulations empowered children to choose "specially designated placements that are prepared to meet their unique needs and create a supportive environment," without excluding religious families with a different viewpoint. 89 Fed. Reg. at 34,819. That echoes the Supreme Court's preference to give unwilling listeners an "opt-out," rather than preventing unwilling and willing listeners alike from hearing certain viewpoints. *See Watchtower*, 536 U.S. at 168 (holding "'No Solicitation' signs … provide[d] ample protection for the unwilling listener"); *Playboy*, 529 U.S. at 815–16 (holding "targeted blocking" option was less-restrictive than categorical blocking of

broadcasts); *Martin*, 319 U.S. at 147 (applying the same logic to invalidate blanket prohibition on door-to-door leafletting).

Vermont could similarly give children choices rather than banning families who do not subscribe to the State's orthodoxy. At least some foster children *want* to be placed in religious homes and hear religious teachings about how to live out their faith. And outside of "relatively narrow and well-defined circumstances," minors have the same right to receive information as anyone else. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975) ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them."). Yet Vermont prohibits everyone from hearing Plaintiffs' religious speech, "whether [they] want that protection or not." *Martin*, 319 U.S. at 143.

**Fourth**, Vermont's viewpoint discrimination is a constitutional dead end in any context. If the State seeks to suppress certain views to "shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists." *Playboy*, 529 U.S. at 813. For good reason, too—the implications of Vermont's logic are constitutionally noxious. It would allow the government to exclude anyone with the "wrong" view on *any* issue because some children might not want to hear it. It could exclude progressive families because a child they adopt might one day become

conservative. Or it could exclude atheists who won't verbally affirm and support a child's newfound religious faith (or vice-versa).

One court tried this logic when it prohibited a pair of atheists from adopting an infant. *In re Adoption of E*, 279 A.2d at 789 (describing lower court's opinion rejecting adoption application). It speculated that the infant might become religious, and the "child should have the freedom to worship as she sees fit and not be influenced by parents or exposed to the views of prospective parents who do not believe in a Supreme Being." *Id*. That decision was promptly (and correctly) reversed because it infringed on the constitutional rights of the adoptive parents. *Id*. at 790. A ruling for Vermont would follow in the misguided footsteps of that trial court decision and allow the exploitation of speculative fears to burden constitutional rights.

### C. Vermont's flawed evidence reveals ideological, not evidence-based, goals.

The Policy collapses under any form of heightened scrutiny, and the State's proffered evidence about harm does nothing to prop it up.

Vermont's Policy rests on a flawed premise: that families who dissent from its ideological views are categorically unfit to care for any LGBT child. The district court echoed this assumption (SA026–27) but never found that applying the Policy to Plaintiffs advanced Vermont's interests. *See Annucci*, 895 F.3d at 190 (state must show that law's application "to the person" advances the state's interest). It did not find

54

that Plaintiffs' speech was likely to cause any harm or that exposure to their beliefs posed any risk. Instead, it slotted Plaintiffs into a reductive affirm-or-reject binary, ignoring the "particularized" and "precise" showing that strict scrutiny requires. *Id.* at 190.

Not only was no such finding made—the evidence doesn't even point in that direction.[4] Vermont produced two categories of putative evidence: one from its internal LGBT taskforce, and one derived from third-party research, including a study about "acceptance" and "rejection" of LGBT individuals and two studies on the use of a person's chosen pronouns. Neither category supports Vermont's exclusionary policy.

Start with the LGBT taskforce. After reviewing all the data, Vermont promulgated Policy 76. JA312–13. That policy says Department officials should "encourage[ ]," not force, parents to support a child's gender expression. JA168. It also envisions accommodating families who are (i) loving, (ii) "not rejecting," and (iii) simultaneously "not as supportive as the young person needs." JA168. That describes

---

[4] These facts are reviewed de novo, both because they implicate Plaintiffs' constitutional claims on appeal and because they constitute legislative facts. *French*, 985 F.3d at 175; *Menora v. Ill. High Sch. Ass'n*, 683 F.2d 1030, 1036 (7th Cir. 1982) ("Legislative facts are those general considerations that move a lawmaking or rulemaking body to adopt a rule, as distinct from the facts which determine whether the rule was correctly applied."). Although the "clearly-erroneous standard does not apply," *Menora*, 683 F.2d at 1036, Vermont's Policy fails under any standard.

the Wuotis and the Gantts. Vermont agrees that they would "offer warmth and compassion to any child," JA233; *see also* JA136–38. They just couldn't assent in the way Vermont demands. Plus, Policy 76 emphasized individualized placements with "LGBTQ affirming" families (JA165), much like the Biden Administration regulations emphasize "designated placements," 89 Fed. Reg. at 34,819. Vermont could do something similar here. Instead, it opted for a broad-brush exclusion simply because that was more ideologically palatable.

Next, Vermont's studies suffered from many methodological flaws. The district court seemed to rely mostly on two studies by the Family Acceptance Project on the importance of "acceptance" and the harms of "rejection." *Compare* SA007, *with* JA280. Vermont cited only one of these studies, plus pamphlets referencing the other study, and none of these documents even fully described the types of negative or positive family experiences they measured. *See Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 578 (7th Cir. 2001) ("psychological studies" on video games did not support restriction on sales to minors because there was "no indication that the games used in the studies [we]re similar to those in the record"). But here, it is "undisputed" that the Wuotis and Gantts "are warm, loving, kind, and respectful people who have a history of parenting foster children without raising any concerns." SA010. So "rejecting" behaviors like "slapping," "name-calling," excluding a child from family activities, or pressuring a child to be more

56

or less masculine/feminine are diametrically opposite of what Plaintiffs would do.[5] *Compare* JA168–69 *with* JA125–26, 146–48. If anything, Plaintiffs scored highly in the "acceptance" box because they repeatedly explained that they would love the child unconditionally, empathize with their struggles, and ensure the child felt cared for. *E.g.*, JA124–26.

It's revealing that Vermont's own sources disavow its exclusionary policy. Vermont cited one letter by the director of the Family Acceptance Project explaining that religious families "don't have to choose between their LGBT child and their faith."[6] JA302. She emphasized that "all families—especially socially and religiously conservative ones"—could still "support their LGBT children" using "simple actions that don't require them to accept a 'behavior' or 'identity' they don't condone."[7] And the Biden Administration (which Vermont also cited at JA279) reviewed largely the same studies which Vermont relies on, including the Family Acceptance Project studies, and concluded agencies should accommodate—not exclude—religious

---

[5] Vermont linked to this source. JA280 (citing *Supportive Families, Healthy Children Helping Latter-day Saint Families with Lesbian, Gay, Bisexual & Transgender Children*, available here: https://familyproject.sfsu.edu/sites/default/files/documents/FAP%20LDS%20Booklet%20pst.pdf) (see pages 12–13).

[6] *Citing* Caitlin Ryan, *Parents Don't Have to Choose Between Their Faith and Their LGBT Kids*, Wash. Post (Jan. 7, 2015), https://perma.cc/994R-G97G.

[7] *Id.*

families who do not want to violate their beliefs. 89 Fed. Reg. at 34,827, 34,840. That shows that Vermont's evidence is far from compelling. These authors agreed with Vermont's goals, looked at Vermont's evidence, and explicitly rejected Vermont's methods. They agree that "there is a difference between accepting and supporting a child versus accepting and supporting something a child says, believes, or does"— exactly what Plaintiffs believe. JA122.

Moreover, in the hierarchy of scientific evidence, systematic reviews sit at the top while cross-sectional snapshots of the type Vermont invokes sit near the bottom. Gordan Guyatt et al., *Users' Guide to the Medical Literature: A Manual for Evidence-Based Clinical Practices* 16, 31 (3d ed. 2015). They are susceptible to bias, cannot speak to causation, and will frequently sample unrepresentative slices of the population (as Vermont's studies did). *Id.* at 55, 303–06, *see also id.* at 309 (explaining that in cross-sectional studies "the direction of association may be difficult to determine").

Consider *Brown*. 564 U.S. at 800. There, California tried to justify a ban on selling violent video games to minors by citing studies showing these games were "significantly linked to increases in aggressive behaviour[.]" *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 963 (9th Cir. 2009), *aff'd sub nom. Brown*, 564 U.S. 786. But that evidence wasn't enough because it did "not prove that violent video games *cause* minors to *act* aggressively." *Brown*, 564 U.S. at 800; *see*

*also United States v. Alvarez*, 567 U.S. 709, 725 (2012) (demanding "direct causal link"); *Brown*, 564 U.S. 799–800 (state "bears the risk of uncertainty"); *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 543 (1980) ("Mere speculation of harm does not constitute a compelling state interest.").

Vermont proved even less here, relying solely on low-quality surveys or cohort studies which Plaintiffs rebutted with a systematic review of the evidence. *Compare* JA278–81 *with* JA541–46. That review by the University of York looked at the studies on social transitioning (including Vermont's studies on pronouns) and concluded they were of such "low quality" that it was impossible to show any positive mental-health outcomes. JA546. A different study Plaintiffs submitted came to the same conclusion, noting that "there were no significant effects of social transition or name change on mental health status." JA590. And a recent Department of Health and Human Services report evaluating these studies similarly found that "the impact of social transition … remains poorly understood" and the evidence base is "very low."[8] Vermont's materials on "acceptance" and "rejection" largely centered on one low-quality, cross-sectional survey of unrepresentative samples. *See*

---

[8] Department of Health and Human Service, *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* 13, 84 (2025), https://opa.hhs.gov/sites/default/files/2025-05/gender-dysphoria-report.pdf.

JA281. Vermont's flimsy evidence of correlation is insufficient to carry the State's burden here. *Brown*, 564 U.S. at 799–800.

Indeed, if weak correlation like this could carry Vermont's burden, states could exclude all sorts of families for all sorts of reasons. One 2023 study found that persons with progressive "identity politics" had "lower levels of well-being" than political conservatives.[9] A 2022 Columbia University study of over 86,000 minors similarly concluded that adolescents with liberal political views were more likely to suffer loneliness and depression.[10] According to Vermont, these studies justify excluding foster applicants who want to convey politically liberal views to their children. This Court should refuse Vermont's invitation down this slippery slope.

## IV.  Plaintiffs deserve a preliminary injunction.

"[I]n First Amendment cases the likelihood of success on the merits is the dominant, if not the dispositive, factor." *Agudath Israel*, 983 F.3d at 637 (cleaned up). Because Plaintiffs are likely to succeed on

---

[9] George Yancey, *Identity Politics, Political Ideology, and Well-being: Is Identity Politics Good for Our Well-being?* 38 Sociological Forum 4, 1245–1265 (2023), https://doi.org/10.1111/socf.12966.

[10] Catherine Gimbrone et al., *The Politics of Depression: Diverging Trends in Internalizing Symptoms Among US Adolescents by Political Beliefs*, 2 SSM Mental Health 100043 (2022), https://doi.org/10.1016/j.ssmmh.2021.100043.

the merits of each of their claims, they can easily show that they satisfy the remaining criteria for a preliminary injunction.

First, the injunction is necessary to avoid irreparable harm. There is a "presumption [that] irreparable injury ... flows from a violation of constitutional rights." *Id.* at 636 (cleaned up). This injury is compounded by the Gantts' fear that their window to foster is closing as they age. JA153.

Second, the balance of the equities and the public interest weigh in Plaintiffs' favor. Here, the equities and the public interest merge, and "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Israel*, 983 F.3d at 631, 637. That's especially true because Vermont's Policy reduces rather than maximizes the pool of licensed foster homes that can lovingly care for vulnerable kids. So permitting the Wuotis and the Gantts to pursue their foster-care license poses no harm to anyone. Constitutional violations of this nature "weigh[] heavily in favor of granting injunctive relief." *Id.* at 637.

## CONCLUSION

In the proceedings below, Vermont said this case is about "good parenting." JA306. But Vermont cannot deny that Plaintiffs are loving and capable parents. Vermont's disdain for their religious beliefs reveals that this case is really about an ideological disagreement. And

*only* on this one topic does Vermont demand that parents speak against their conscience and compromise their beliefs—or be labeled "bad" parents.

Plaintiffs do not claim a right to become foster parents. They merely ask for the opportunity to obtain their foster-care license on the same terms as anyone else: without having to give up their First Amendment rights. This Court should reverse the district court and remand with instructions to enter a preliminary injunction.

Dated: May 30, 2025

Respectfully submitted,

*s/Johannes Widmalm-Delphonse*

| | |
|---|---|
| John J. Bursch | James A. Campbell |
| Caroline C. Lindsay | Johannes Widmalm-Delphonse |
| Suzanne E. Beecher | ALLIANCE DEFENDING FREEDOM |
| ALLIANCE DEFENDING FREEDOM | 44180 Riverside Pkwy |
| 440 First Street NW, Suite 600 | Lansdowne, VA 20176 |
| Washington, DC 20001 | (571) 707-4655 |
| (202) 393-8690 | jcampbell@ADFlegal.org |
| jbursch@ADFlegal.org | jwidmalmdelphonse@ADFlegal.org |
| clindsay@ADFlegal.org | |
| sbeecher@ADFlegal.org | |

Jonathan A. Scruggs
Henry W Frampton, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Gretchen M. Wade
WADLEIGH, STARR & PETERS, PLLC
95 Market Street
Manchester, NH 03101
(602) 206-7262
gwade@wadleighlaw.com

*Counsel for Appellants*

62

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because this brief contains 13,736 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: May 30, 2025

*s/Johannes Widmalm-Delphonse*
Johannes Widmalm-Delphonse
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate ACMS system. I certify that all participants in the case are registered ACMS users, and that service will be accomplished by the ACMS system.

*s/Johannes Widmalm-Delphonse*
Johannes Widmalm-Delphonse
*Counsel for Appellants*

# ADDENDUM

# ANNUAL
# REPORT
## 2024

**In accordance with 33 VSA § 3203(a)(6)**

**Submitted to:**
Governor Phil Scott
Vermont General Assembly

**Prepared by:**
Matthew Bernstein, Child, Youth, and Family Advocate
Lauren Higbee, Deputy Child, Youth, and Family Advocate

**Report date:**
December 1, 2024



VERMONT
OFFICE OF THE CHILD, YOUTH, AND FAMILY ADVOCATE

Add.001

# TABLE OF
# CONTENTS

**Introduction**
3   Letter from the Advocate
4   Who We Are, What We Do, What We Value
5   Our Work In 2024

**Finding A: Children Belong in Their Communities**
6   Child Maltreatment at All-Time Lows, Racial Disproportionalities Remain
7   Child Safety Response and Kin Diversion in Vermont
9   Economic Support to Families Prevents Children from Entering Foster Care
10   Preserving Social Security Benefits for Children
11   Support For Kin Relieves Pressure on Families, DCF, and the Courts

**Finding B: Community Alternatives to Institutions are the Right Investment**
13   Children Succeed in Homelike Settings, Institutional Care Should be a Last Resort
16   DCF's Use of "Staffings" is Routine, Expensive, and Traumatizing
17   Restraint and Seclusion are Routine and Underreported
18   Re-Envisioning Youth Justice in Vermont

**Finding C: A Family-Centered Child Welfare System in Vermont Is Affordable and Within Reach**
21   Title IV-E Legal Reimbursement Could Save Vermont $1.75 million Each Year
22   Vermont's Investment in Residential Care is Increasingly Costly
23   Envisioning a Human-Centered Child Welfare Data System for Vermont

**Conclusion**
25   Letter from the Deputy Advocate
      Child, Youth, and Family Advisory Council
26   Closing

**Appendices**
26   Individual Caseload Data
27   Data Reports Required by Statute

**Endnotes and Sources**

2

Add.002

# LETTER FROM THE ADVOCATE

Last week, a youth in a residential facility in Vermont called me. Our office had been following this young person on paper for quite some time. He had been appearing for many months on the "Missing List," a weekly email from DCF with information about youth "on run." We knew some of what he'd experienced during his time in custody, but we had never met him. He had turned up a month or so prior, and I'd spent a few hours talking with him in an emergency department bay before he sank back into the residential treatment system.

When I saw the caller ID, I was worried that something bad had happened. And sure enough, he sounded upset.

"They won't let me go outside," he said. "They say if it's below 32 degrees it's child abuse. I'm bouncing off the walls in here."

I was caught off guard. "Sorry, what?"

"They say it's child abuse if I go outside. That's what they said. You gotta tell them to let me out."

I said I'd see what we could do. We reached out to the program directly, and he was outside within an hour.

This kind of advocacy is in so many ways common and unremarkable. But the story stands out to me as a symbol of the basic human need for connection held by every child, youth, and family in Vermont.

**The notion that a young person without a phone would call a government official simply to ask for what most of us take for granted—that, to me, is profound**. It shows that young people will raise their voices when given the chance. It shows that we should listen.

Speaking to children, youth, and families almost every day is the bread and butter of this office. Like the youth described above, when parents stuck in large and impersonal systems call our office, they usually ask for the elements of basic dignity—someone to listen and validate, assess and explain their situation honestly, follow up. Of course, what most also need is robust legal representation, high quality mental health supports close to where they live, a roof over their heads, money in their pockets.

In challenging fiscal times, it can be tempting to find cost savings at the expense of those with low political capital. We see this pattern accelerating in child welfare and juvenile justice. But as this report shows, austerity in these fields would be a huge mistake. **Child welfare may be the area with the most potential for revenue enhancement and return on investment of any in government.** This report shows how Vermont could leverage millions of federal dollars to support young people—and, while we're at it, workers too.

Keeping children safe remains a core function of government. The place where children feel most safe is in their homes and communities. We stand with the many Vermonters already committed to translating these principles into action.

In service,
Matthew Bernstein



Add.003

# WHO WE ARE

- We are a two-person office within Vermont state government that operates independently of the Department for Children and Families (DCF) and the Agency of Human Services (AHS).

- We advocate for the dignity, well-being, and interests of Vermont's children and youth, with a focus on the child protection and juvenile justice systems.

- We translate the vision of children, youth, and families into policy that safely sustains the bonds of families.

# WHAT WE DO

- We promote reforms – in individual cases and systemwide – that improve the lives of Vermont's children, youth, and families, with a focus on racial and social equity.

- We spend time listening to impacted children and youth in the places where they are, centering their experiences, uplifting their voices, and integrating their input into advocacy and policymaking.

- We receive complaints and requests for assistance from Vermonters impacted by DCF. We educate, energize, and empower Vermonters to navigate complex systems. Our goal is swift and sustainable resolutions that support impacted children and youth.

- We promote prevention and advocate for upstream interventions that leverage federal dollars and reduce Vermont's reliance on our General Fund. We support economic policy that strengthens Vermont's families and saves the state money.

# WHAT WE VALUE

- We advocate for common sense solutions and press for transparency, equity, and accountability on behalf of children and youth.

- Our guiding questions are: Are the child welfare and juvenile justice systems supporting the youth they serve? Are children and youth in the state's care safe and supported?

- We collaborate with DCF whenever possible. We believe that improving conditions for young people also improves conditions for DCF workers.

4

Add.004

# FINDING B: COMMUNITY ALTERNATIVES TO INSTITUTIONS ARE THE RIGHT INVESTMENT

## Children Succeed in Homelike Settings, Institutional Care Should be a Last Resort

- If children *do* have to come into state custody *and* kin placements are not available, the next best option is often a non-kin family foster home. **Family-like environments provide normalcy to young people and avoid institutionalization**.

- Youth comprised just 8% of referrals to the OCYFA in 2024, due primarily to OCYFA lack of outreach capacity. Visiting children and youth in institutions is a top OCYFA priority that takes significant resources. Most youth are unlikely to contact the Office themselves but they often ask for assistance and want to know their rights once connected.

### Foster Homes with Active Licenses in Vermont
### 2020-2024

| Year | 2020 | 2021 | 2022 | 2023 | 2024 |
|------|------|------|------|------|------|
| Total | 1335 | 1135 | 956 | 821 | 811 |

- As a result of multiple factors, including the decline in available foster homes, Vermont relies on residential treatment programs to house children in state custody. **Keeping children out of the residential care system, even at significant expense, should be a top priority for Vermont policymakers**.

- Children are often re-traumatized while in residential programs. Because Vermont has failed to modernize its digital databases, **DCF lacks the ability to see child abuse and regulatory investigations by facility**. In other words, DCF cannot click on a facility name and see allegations and investigations related to that facility.

> *"It is fundamentally flawed to separate adolescents from their community, family, friends, and support systems without causing irreparable harm to the child and to their friendships."*
> *– Parent of child in residential care*

13

Add.005

### FINDING B: COMMUNITY ALTERNATIVES TO INSTITUTIONS ARE THE RIGHT INVESTMENT

## Children Succeed in Homelike Settings, Institutional Care Should be a Last Resort

- DCF has contracts with 43 residential programs, in state and out. **The total cost of Vermont's residential system is unclear.** At least one program receives more than $100,000 per month, "regardless of utilization," meaning that the program is paid whether or not it is serving any youth. When the OCYFA visited this program on one occasion, it was empty.

- **Due to changes in federal law, Vermont has lost nearly all federal IV-E funding for residential care** (see Finding C). The state now relies on a combination of General Fund and Medicaid dollars to pay for residential care programs.

- **As of October 2024, 83 youth in DCF custody were in residential programs.** According to DCF data, as of late 2024, 13 children have been in residential care between nine months and a year. An additional 12 children have been in residential care between 12 and 18 months. Five children have been in residential care between 18 and 24 months, and four children have been in residential care for more than 24 months, with the longest length of stay approaching three years. **Among these youth, the average total placements per youth is 8, and the median is 6.**



**Residential Length of Stay for Children in DCF Custody, October 2024**

Add.006

### FINDING B: COMMUNITY ALTERNATIVES TO INSTITUTIONS ARE THE RIGHT INVESTMENT

## Children Succeed in Homelike Settings, Institutional Care Should be a Last Resort

- **Vermont youth are a valuable and underutilized resource on residential programs**. Young people in residential care recognize that they are being shuffled around, learn industry acronyms, and crowdsource program quality. Sometimes they intentionally misbehave to get sent to a higher quality, though more secure, placement.

- **Vermont should take stock of program quality** and spending as a pre-requisite to system change.



*"All I know is it's just me and a bed."*
*- Youth in Residential Care System,*
*on being moved from program to program*

> "My experience in a residential treatment facility was about containment and not about treatment. The culture was punitive. It included exposure to overwhelming violence, a lack of affection and common sense, and an inability to see things from a child's perspective."
>
> *– Former Foster Youth*

## OCYFA RECOMMENDATIONS

| | | |
|---|---|---|
| The Vermont legislature should commission an **updated analysis of Vermont's use of residential care** modeled on the federal Stop Institutional Child Abuse Act | Vermont should **raise standards for residential facilities**, improve oversight, and prioritize community-based services | DCF should **compile regulatory infractions by facilities** on a publicly available dashboard |

## FINDING B: COMMUNITY ALTERNATIVES TO INSTITUTIONS ARE THE RIGHT INVESTMENT

# DCF's Use of "Staffings" is Routine, Expensive, and Traumatizing

- **A "staffing" is an unlicensed, unregulated place that isolates children**. Vermont has a deep legacy of eugenical separation of children with disabilities.

- A "staffing" occurs when DCF deems a child or youth unsafe to themselves or others, and/or when DCF can find no other placement for them. The child is then held at a hotel, sheriff's office, or other location, with no access to education, treatment, peer interactions, or community engagement. DCF staff, contractors, and sometimes law enforcement personnel work in shifts round the clock to sit with the young person, often working overtime outside of their home districts. **Youth in these settings are disproportionately developmentally or intellectually disabled.**

- While a small number of youth "staffed" might qualify for placement in a locked facility, the vast majority are there because of inadequacies in Vermont's system of care.

- In 2024, four children in DCF custody were "staffed" for 10-15 days, three for 16-25 days, and two for longer than 25 days. These numbers include the 19-day "staffing" of a six-year-old with significant developmental disabilities.

- **DCF acknowledges the inappropriateness of these placements and the harm they inflict on children**.

- Since July of 2022, according to its own estimates, DCF has spent more than $2.5 million in General Fund money on "staffing" settings. **These settings are ineligible for federal funding due to their unlicensed, unregulated status.**

- The cost of these settings has been increasing, from approximately $57,000 per month on average in 2022-2023 to an average of $147,000 a month in 2024.





**DCF Total "Staffings" of Youth & Children**

*Light area shows estimated 2024 total, based on partial year data. Source: DCF data*

16

Add.008